IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF: ) | Case No. 1:17mj3283 |
| EXTRADITION OF ATTILA NAGY ) | |
| ) | MAGISTRATE JUDGE |
| ) | THOMAS M. PARKER |
| ) | |
| ) | **Order on Motion for Bond** |
| ) | |
| ) | |

## I.     Introduction

This matter is before the court on the motion filed by Attila Nagy for an order releasing him on bond. On November 13, 2017 the United States filed an extradition complaint under 18 U.S.C. § 3184, based upon a request from the government of Romania and upon an extradition treaty between the United States and Romania. ECF Doc. 1. The complaint alleges that Romania requested Nagy after he was convicted in absentia of two counts of complicity to commit insurance fraud.

## II.     Factual Record and Contentions

The United States filed a Declaration of Michael N. Jacobsohn, dated August 25, 2017 which attested to certain facts and appended certain documents. ECF Doc. 1-2, pp. 1, 3. The Jacobsohn declaration indicated that Romanian Diplomatic Note 425, requesting the extradition of Attila Nagy, was dated February 24, 2014. ECF Doc. 1-2, pp. 3, 4. The extradition request was received at the U.S. Department of State on February 27, 2014. Id. The Romanian Ministry

of Justice provided additional information in support of its extradition request on October 16, 2016 and March 27, 2017. ECF Doc. 1-2, pp. 5, 6.

The United States and Romania signed an extradition treaty on September 10, 2007. ECF Doc. 1-3, p. 39.

Nagy was convicted of the offense of complicity to fraud in violation of the Romanian Penal Code, Article 26 in conjunction with Article 215(2) and (3) of that code; he also was convicted of complicity to intellectual forgery in violation of Article 26 of the Romanian Penal Code in conjunction with Article 289 of that code. The respective offense dates for these convictions were in 2000 and 2001. The convictions became final on September 17, 2007 and September 1, 2008. ECF Doc. 1-5, p. 2. For each conviction, Nagy was sentenced to serve three years of imprisonment. Id. at pp. 2, 3. The prison terms were suspended and Nagy was placed on six years of probation with the requirement that he periodically appear at the Probation Services attached to the Tribunal of Salaj. Id.

Nagy contacted the probation services office on December 19, 2011 indicating that he could not comply with the requirements of his probation because he was in the United States without proper legal status and returning to Romania could endanger his future in the U.S., where he had been living for ten years. Id. at 10. In that same telephone call, Nagy was directed to provide by electronic and later regular mail documents attesting to his identity, place of domicile and his job; the deadline for submission was December 31, 2011. Id. Because Nagy did not provide the requested information by the deadline, a new telephone conference with Nagy was conducted on January 10, 2012; a new deadline of January 13, 2012 by which Nagy was directed to submit the required information was set. Id. at 10-11. Nagy did not comply. Id.

at 11. But Nagy filed a recourse against the penal judgment, but the recourse was rejected by Penal Decision no. 294/R/09.11.2012. Id.

The Local Court of Oradea initially rejected – on three occasions – the request for revocation of Nagy's suspended sentence because it might have been possible to supervise Nagy by means other than in-person appearances and also because of the possibility that Nagy was unaware of the probation requirements. Id. at 9. But after Nagy's failure to communicate his contact information by the two dates noted above, the court concluded that Nagy acted in bad faith when he refused to return from the United States to Romania, "or, at least, to submit to supervision in a certain form for the fulfillment of the supervision measures ordered" by the penal judgment. Id. at 11. The court also noted that Nagy, although represented by counsel, failed to appear both in the penal prosecution stage and before the court of law; he also failed to appear at the judgment when revocation of the suspended sentence was being considered. Id.

Because Nagy failed in bad faith to comply with the terms of probation, Nagy's suspended sentences were revoked and Nagy was ordered to serve a prison sentence of three years and four months. Id. at 4, 10. Thereafter, on November 14, 2012 the Local Court of Oradea, Romania issued its detention order on the name of Attila Nagy. Id. On January 19, 2013 a European arrest warrant was issued; and, on January 30, 2013 an international search warrant for extradition was issued. Id.

At the December 15, 2017 bond hearing, counsel for Nagy asserted the existence of "special circumstances" that would justify bond being issued. Nagy proffered that the following facts could be established:

- Nagy arrived in the United States in 2001, without lawful status, on a train that came into the country from Canada.
- Nagy has been involved in no criminal activity while in the United States during the past 16 years.

3

- The insurance fraud of which Nagy had been convicted in Romania were not serious offenses under comparable United States statutes.
- Nagy did not flee Romania because of the potential for criminal convictions.
- Nagy is married and has two children; his wife and children love him and depend upon him.
- Nagy's wife has diagnosed depression which is being exacerbated by the current proceedings.
- Nagy and his wife own a home in Westlake, OH.
- Nagy established the business Nagy Quality Stone which has grown from a small operation into one which employs 10-11 persons.
- Nagy's business is expected to gross $1.8 million in revenue in 2017.
- Nagy has been ordered removed from the United States through immigration proceedings that have been ongoing for several years; however, Nagy has filed to have the removal order cancelled and has been granted a $10,000 cash bond by the immigration court.
- Because Nagy's home, business and family are all located here, Nagy has no reason to flee and not return to court for his extradition proceedings.
- Nagy has retained counsel in Romania to seek to have his Romanian convictions overturned.
- Romanian counsel anticipates a decision on this effort by early January 2018, but has advised Nagy's counsel, Richard Drucker, that the chances are 50/50 that the convictions would be overturned. Nagy's Romanian counsel acknowledged that the local court declined to overturn the convictions. The current legal process is in the Supreme Court of Romania.
- Nagy believes the Romanian courts that are considering the effort to overturn the convictions are aware of the instant extradition proceedings.
- Nagy challenges the factual statements made by his co-conspirators, who implicated Nagy in the insurance fraud scheme.
- Nagy is of Hungarian descent and was living in Romania before coming to the United States.
- Nagy's primary special circumstance relates to the delay between the time of the conduct alleged in his Romanian criminal charges and the time of the request for extradition. He notes that the conduct was said to have occurred in 2000 and 2001 and the convictions occurred in 2004.
- Nagy believes it is not fair that the United States delayed acting on the extradition request until December 2017, a delay of some thirteen years.
- Nagy felt he could not return to Romania because he might lose some benefit from his uninterrupted years of status in the U.S. He was concerned that if he left, he would not be permitted to return to the U.S., a possibility that could cost him his ability to reconnect with his family. Nagy characterized this possibility as "Draconian."
- Nagy asserted that he is benefit to his community as a family man and business owner who pays his taxes and employs people.

- Nagy offered to call as witnesses his family members and friends, who would have unanimously supported the proffered facts and who would have asserted that Nagy is a wonderful father, an honest person and a great human being.
- Nagy indicated an ability to post any kind of cash bond the court might require, even up to $200,000 if necessary.

The United States countered Nagy's primary "special circumstances" argument (that it was not fair to extradite him in 2017 for convictions entered in 2004) by pointing out that the records from Romania attached to the complaint indicated that Nagy had been aware of the convictions and had been engaged in ongoing efforts to overturn or otherwise delay the potential to have to meet the requirements of Romanian probation or serve any terms of incarceration ordered by Romanian courts. Thus, the United States points out that Nagy himself is partly responsible for the delay prior to the commencement of extradition proceedings. The United States also argued out that Nagy's access to substantial sums of money indicated that he had the ability to flee, with his family. And the United States asserted that Nagy's status as an undocumented alien also tended to support the argument that he had an incentive to flee.

**III.    Applicable Law on Release**

The federal statute that implements the United States' extradition treaties with other nations, Title 18 U.S.C. §§3184 et seq., does not provide for bail. An international extradition proceeding is not considered a criminal case, and therefore the Bail Reform Act, Title 18 U.S.C. 3141 et. seq., does not apply. *Kamrin v. United States*, 725 F.2d 1225, 1227-28 (9th Cir. 1984); *United States v. Hills*, 765 F.Supp. 381, 385 n. 5 (E.D. Mich. 1991). In fact, in foreign extradition cases, it is well established, that there is a presumption against bail. Wright v. Henkel, 190 U.S. 40, 63, 23 S. Ct. 781, 47 L. Ed. 948 (1903); *Beaulieu v. Hartigan*, 554 F.2d 1, 2 (1st Cir. 1977); *United States v. Leitner*, 784 F.2d 159, 160 (2nd Cir. 1986) (*per curiam*); *Salerno v. United States*, 878 F.2d 317 (9th Cir. 1989). "The demanding government, when it has

5

done all that the treaty and the law require it to do, is entitled to the delivery of the accused on the issue of a proper warrant, and the other government is under obligation to make the surrender . . . ." *Wright*, 190 U.S. at 62.

Bail "should not ordinarily be granted in cases of foreign extradition," but may be granted upon a showing of "special circumstances." Id. at 62-63. Special circumstances do not include, standing alone, the fact that the defendant is considered a "tolerable bail risk." *Matter of Russell*, 805 F.2d 1215, 1216-17 (5th Cir. 1986); *Leitner*, 784 F.2d at 159; *Hu Yau-Leung v. Soscia*, 649 F.2d 914 (2nd Cir. 1981). Cases in which the courts have held that special circumstances were not shown include: *United States v. Williams*, 611 F.2d 914 (1st Cir. 1979) (the discomfort of sitting in jail and an arguably tolerable bail risk not special circumstances); *Russell*, 805 F.2nd at 1217 (the need to consult with one's attorney concerning pending civil litigation or extradition proceedings not special circumstances); *In the Matter of the Extradition of Sidali*, 868 F.Supp. 656 (D.N.J. 1994); *United States v. Hills*, 765 F. Supp. 381; *In re Heilbronn*, 773 F.Supp. 1576, 1581-82 (W.D. Mich. 1991)(public interest a medical doctor served did not make the "normal rules of extradition" inapplicable to him). Cases in which special circumstances were found include: *Hu Yau-Leung v. Soscia*, 649 F.2d 914 (defendant was 16 years old and there existed no suitable detention facility); *In the Matter of the Extradition of Kamel Nacif-Borge*, 829 F.Supp. 1210, 1221 (D. Nev. 1993)(court released defendant on a 12 million dollar bond based upon an interpretation of Mexican law allowing release on bail if he posted security in the amount of 80% of the tax debt).

**IV.  Analysis**

This is not a criminal case in which bail would ordinarily be presumed. This is an administrative proceeding arising under international law for certification and approval of the

State Department's decision to extradite this person at the request of the Romanian government. See 18 U.S.C. § 3184. Our law presumes that the Court will commit the Defendant in custody "until such surrender shall be made." Id. I conclude we must do just that. *See Abbott v. Abbott*, 560 U.S. 1, 20, 130 S.Ct. 1983, 176 L.Ed.2d 789 (2010) ( "International law serves a high purpose when it underwrites the determination by nations to rely upon their domestic courts to enforce just laws by legitimate and fair proceedings.").

Notably, the federal extradition statute provides no explicit authority for a district court to grant bail to a potential extraditee. *See* 18 U.S.C. § 3184. Certainly, the Eighth Amendment does not speak to this issue, and neither does the Bail Reform Act. See 18 U.S.C. § 3142 (creating a detailed procedural scheme for making bail determinations in domestic criminal cases but omitting any reference to extradition proceedings). Furthermore, the extradition treaty at issue between the United States and Romania grants no right to bail, does not outline bail procedures, and does not even make any mention of bail. Arguably, therefore, Nagy's request for bond pending final adjudication of the extradition complaint has no constitutional or statutory support.

However, federal common law dating back to the early twentieth century has largely been relied upon to fill in the gap of explicit statutory or international law authority to grant bail. In its only known or cited opinion tackling this subject, *Wright v. Henkel*, the Supreme Court recognized for the first time in 1903 that a court had the power to grant bail in international extradition cases. *See* 190 U.S. 40, 63, 23 S.Ct. 781, 47 L.Ed. 948 (1903). The Court ruled that "while bail should not ordinarily be granted in cases of foreign extradition," it was also not holding that courts, "may not in any case, and whatever the special circumstances, extend the relief." Id.

7

For over a hundred years following this ruling, circuit and district courts have thus applied the "special circumstances" test for bail determinations in extradition cases. *See*, *e.g.*, *Jimenez v. Aristiguieta*, 314 F.2d 649, 653 (5th Cir. 1963)(applying special circumstances analysis under *Wright* in affirming denial of bail); see also United States v. Kin–Hong, 83 F.3d 523, 524 (1st Cir. 1996) ("Special circumstances" are limited to situations in which "'the justification [for release] is pressing as well as plain.'") (quoting in part In re Klein, 46 F.2d 85, 85 (S.D.N.Y. 1930)); *Kamrin v. United States*, 725 F.2d 1225, 1228 (9th Cir. 1984) (" '[S]pecial circumstances' requirement creates standard for extradition cases different from that for federal criminal cases"); *United States v. Leitner*, 784 F.2d 159 (2d Cir. 1986) (applying special circumstances test in affirming denial of bail); *In re Extradition of Russell*, 805 F.2d 1215, 1216 (5th Cir. 1986) (same); *Beaulieu v. Hartigan*, 554 F.2d 1, 1–2 (1st Cir. 1977) (conducting special circumstances analysis in vacating district court order granting bail).

There can be no dispute that the court has the power to grant bail provided that special circumstances exist. Here, however, the court concludes that Nagy has not made the requisite showing. The principal argument he advances is that it would be unfair to extradite him years after he was convicted of the Romanian insurance fraud offenses. That may be an argument he could present to the Secretary of State in an argument against final extradition. It seems a misplaced argument at this stage. Notably, although Nagy has contended the co-conspirator statements are subject to attack, he did not assert that he was simply not guilty of the Romanian crimes. Further, the court concludes that the record shows what the government has contended: that Nagy himself is partly responsible for the time lapse between the convictions and the current extradition proceedings. Nagy has been engaged, directly and through counsel, in efforts to undo his convictions or relieve the penal obligations imposed upon him. He cannot complain of the

passage of time when he has been a part of the reason the time has passed.  The other points Nagy has offered, while demonstrative of the fact that he has been a productive resident and has business acumen, do not rise to the level of "special circumstances." The court has been unable to find – and Nagy has not cited – any case law holding that being a successful business and family man creates a special circumstance to warrant granting bail to someone facing extradition.

Nagy has offered many compelling reasons for the court to conclude that he is not a danger to the community.  To its credit, the United States conceded at the bond hearing that it had no basis on which to contend that Nagy posed any kind of a risk to the community.  Instead, it contended that there is a risk Nagy would flee if released on bond.  Nagy counters the government's argument by pointing to his successful business, his expensive home and his deep family and friendship connections as reasons for the court to conclude that Nagy has no incentive to flee prior to the conclusion of his extradition proceedings.

The issue of Nagy's potential to flee is not simple to dispose of.  As the government points out, Nagy is not lawfully in the United States.  Nagy admittedly has been ordered removed from the United States, though he has taken steps seek to have the removal order vacated.  Given the uncertainty of Nagy's efforts to have the Romanian convictions overturned and the uncertainty of the current immigration proceedings, the court concludes that Nagy's incentive to flee the jurisdiction may well be greater than the anchoring effects of his business and home, particularly if he has access to sufficient cash to uproot his family and quickly leave.  This is not a case in which the person being extradited must return home to face criminal charges; here, Nagy has already been convicted and his multiple requests to get out from under his convictions have not succeeded.  He has an incentive to flee, and he is at risk to do so.

## V.   Conclusion

Because there is no statutory or international law provision for bail in an extradition proceeding, and because Attila Nagy has neither demonstrated the existence of special circumstances to warrant an inherent-power grant of bail by the court, and because the government has shown that Nagy is a flight risk, Nagy's motion for bond must be, and hereby is DENIED.

IT IS SO ORDERED.

Dated: December 21, 2017

Thomas M. Parker
United States Magistrate Judge